O’NIELL, J.
The defendant was indicted by the grand jury of the parish of Orleans, only 9 members being present at the finding and presentment of the indictment, for the crime of murder. He was tried and convicted, and has been sentenced to suffer the penalty of death. On appeal to this court he relies upon two bills of exception, one of which was reserved to the overruling of his motion in arrest of judgment, and the other was reserved to the overruling of his motion for a new trial.
[1, 2] The motion in arrest of judgment refers to the fact that only nine members of the grand jury were present during the deliberations on this case and at the finding *700 and presentment of the indictment. The contention of the learned counsel for the defendant is that, although the Constitution does not require that more than 9 members of the grand jury must concur to find an indictment, the law provides that a quorum shall consist of 12 members.
This question was presented for decision and was decided contrary to the defendant’s contention in the case of State v. Griggsby, 117 La. 1046, 42 South. 497, in State v. Walker, 137 La. 197, 68 South. 407, and in State v. McLaughlin, 138 La. 958, 70 South. 925. The learned counsel for the defendant in this case dispute the correctness of the ruling in the cases cited.
The common law adopted by the thirty-third section of the Crimes Act of 1805 provided that the grand jury should consist of not less than 12 nor more than 23 members; the concurrence. of 12 being necessary to find an indictment. The number of members required to concur to find an indictment in this state was not changed until the adoption of the Constitution of 1898.
In the Act No. 98 of 1880, providing for the organization of the criminal district court of the parish of Orleans, as established by the Constitution of 1879, section 3 contained this provision:
“That the grand jury for the parish of Orleans shall consist of sixteen persons, twelve of whom shall constitute a quorum.”
Article 117 of the Constitution of 1898 provided, and article 117 of the Constitution of 1913 also provides, that:
“A grand jury of twelve, nine of whom must concur to find an indictment, shall be impaneled in each parish,” etc.
It is not contended that the state violated the Fifth or Fourteenth Article of Amendment, or exceeded any restriction or limitation, of the Constitution of the United States, in abolishing the common-law requirement for an indictment for the crime of murder. That serious question was decided in favor of the right of the state in the case of Joseph Hurtado v. People of the State of California, 110 U. S. 516, 4 Sup. Ct. 111, 292, 28 L. Ed. 232, and the question was again considered and the decision affirmed in Hallinger v. Davis, 146 U. S. 314, 322, 13 Sup. Ct. 105, 36 L. Ed. 986; and in McNulty v. California, 149 U. S. 645, 13 Sup. Ct. 959, 37 L. Ed. 882; Hodgson v. Vermont, 168 U. S. 262, 272, 18 Sup. Ct. 80, 42 L. Ed. 461, 464; Holden v. Hardy, 169 U. S. 366, 42 L. Ed. 780, 18 Sup. Ct. 383; Brown v. New Jersey, 175 U. S. 172, 44 L. Ed. 119, 20 Sup. Ct. 77; Bolln v. Nebraska, 176 U. S. 83, 44 L. Ed. 382, 20 Sup. Ct. 287; and Maxwell v. Dow, Warden of Utah State Prison, 176 U. S. 581, 617, 20 Sup. Ct. 448, 494, 44 L. Ed. 597, 611.
The only question presented by this bill of exception therefore is whether the law of this state requires that all of the 12 members composing the grand jury shall be present, or only requires that 9 members shall be present, to constitute a quorum.
In the Act No. 135 of 1898, carrying out the provisions of articles 116 and 117 of the Constitution of 1898, relating to juries in other parishes than the parish of Orleans, section 7 provided that:
“The grand jury shall be composed of twelve members, nine (9) of whom must concur to find an indictment.”
Section 7 of the Act No. 135 of 1898 was amended and re.enacted by Act No. 155 of 1906 (relating to juries in the state of Louisiana, the parish of Orleans excepted) so as to declare expressly that 9 members of the grand jury should constitute a quorum in other parishes than the parish of Orleans, viz.:
“The grand jury shall be composed of twelve members, nine (9) of whom must concur to find an indictment, and nine members present shall constitute a quorum for the transaction of business with full power and authority to investigate all matters and to find and report indictments and other matters, the same as if the twelve were present and acting, provided that, when less than twelve are present, at least nine (9) shall concur to find indictments or report on *702 other matters. In the event the foreman should be absent, then the presiding judge shall appoint one of the remaining eleven as acting foreman, or foreman pro tempore, who shall possess and exercise all the powers (whilst so acting) of the foreman.”
As the Act No. 155 of 1906 does not apply to the parish of Orleans, there has been no legislation reducing the number of grand jurors necessary to constitute a quorum in the parish of Orleans since the number required to constitute a quorum was fixed at 12 by Act No. 98 of 1880, unless the provision in article 117 of the Constitution of 1898 and of 1913 that 9 members of the grand jury must concur to find an indictment means that 9 members shall constitute a quorum.
It might be inferred, from the fact that the Legislature saw fit to amend section 7 of Act No. 135 of 1898 by declaring expressly in Act No. 155 of 1906 that 9 members of the grand jury (in other parishes than the Parish of Orleans) shall constitute a quorum, that it had not been so provided by article 117 of th'e Constitution, declaring that 9 members of the grand jury must concur to find an indictment. Our opinion, however, is that this legislation as to other parishes than the parish of Orleans was intended merely to remove any doubt that 9 members of the grand jury should constitute a quorum, under article 117 of the Constitution. It was held in the case of State v. Causey, 43 La. Ann. 901, 9 South. 900, when the law (Act No. 44 of 1877) required that the grand jury should be composed of 16 members, and that 12 had to concur to find an indictment, that it was not required that more members than the number necessary to find an indictment should be present and take part in the deliberations. It was therefore held, inferentially at least, that the number of grand jurors required to constitute a quorum was the number whose concurrence was necessary to find an indictment.
Applying the rule of reason and pursuing the spirit of the law, without having to depart from its letter, it is reasonably certain that the defendant was not prejudiced by the fact that no more grand jurors took part in finding the indictment against him than the law required should concur in the finding. Assuming that each member of the grand jury is governed by his own conscience and judgment in the deliberations and findings of that body, a defendant is more secure from the finding of an indictment against him by the concurrence of 9 members of the grand jury when only 9 are present than he would be if a greater number were present.
We are reminded that, although the Constitution only requires the concurrence of 9 members of a petty jury of 12 to render a verdict in a prosecution for which the penalty is imprisonment at hard labor, the law requires that all of the 12 jurors must be present during their deliberations and at the finding and rendering of the verdict. That is because the common law requires that the members of a petty jury must not separate from the time they are impaneled until they render their verdict in a capital case, and from the time the case is submitted to them until they render their verdict, where the offense is not capital. But that provision of the common law has nothing to do with the number of members of the grand jury required by the Constitution or by statute to constitute a quorum or to concur in finding an indictment.-
Our conclusion is that the provisions of article 117 of the Constitution of 1898 (retained in the Constitution of 1913) that the grand jury in each parish of this state shall consist of 12 members, and that 9 of them must concur to find an indictment, superseded entirely, in the parish of Orleans, the provisions of section 3 of Act No. 98 of 1880 that the grand jury for the parish of Orleans should consist of 16 persons, 12 of whom should constitute a quorum. The expression *704 “twelve of whom,” In the provision of section 3 of Act No. 98 of 1880 “that the grand jury for the parish of Orleans shall consist of sixteen persons, twelve of whom shall constitute a quorum,” meant 12 of the 16 persons required by that statute to constitute a grand jury. It would be unreasonable to hold that, when the framers of the Constitution reduced the number of members necessary to constitute a grand jury from 12 to 16, by abolishing the provision of section 3 of Act No. 98 of 1880 “that the grand jury for the parish of Orleans shall consist of sixteen persons,” they retained in force and effect the requirement “twelve of whom shall constitute a quorum,” so that the “twelve of whom” would mean all 12 members of the grand jury.
We have considered the defendant’s contention as an original proposition, as if the question had never been presented before; and, with much deliberation, we come to the conclusion that our former rulings on this question are correct; that the number of members of the grand jury for the parish of Orleans required to constitute a quorum is the number of members who must concur to find an indictment; that is, 9 members, according to article 117 of the Constitution.
[3] The defendant’s motion for a new trial was founded on his averment that he had discovered new and additional evidence after his conviction. He alleged that Abraham Gerson and Miss Fannie iPailet would testify that on the morning of the killing they heard the deceased threaten to take the life of the accused, and that Mrs. Abraham Gerson would testify that on the day before the killing she heard the deceased threaten to take the life of the accused. The motion contains the allegation that the attorneys representing the defendant did not know, and could not have ascertained with due diligence, before the trial of the case, that the witnesses above named would testify to the facts recited. And it was alleged that the newly discovered evidence was not cumulative and was pertinent and important. The motion was supported by the affidavits of the witnesses that they would testify to the facts recited in the motion, and it was also supported by the affidavits of the attorneys for the accused that they only learned of the newly discovered evidence after the conviction of the defendant, and that they could not, by the exercise of due diligence, have learned before the trial that the witnesses named, or any other witness, would swear to the facts recited in the motion; “the said witnesses being not at all friendly to the accused.”
Mr. and Mrs. Abraham Gerson and Miss Fannie Pailet testified on the trial of the motion for a new trial, and the state introduced in evidence a statement signed by Mrs. Gerson two days after the homicide, together with the testimony of the police officer before whom the statement was signed. The. evidence adduced on the trial of the motion, together with the testimony given by the defendant in his trial before the jury, is attached to and forms part of the bill of exception reserved to the overruling of the motion for a new trial.
In the statement per curiam, in the bill of exception, the following reasons are given for overruling the motion for a new trial, viz.: That the defendant did not exercise due diligence to obtain the evidence before he was convicted; that the testimony offered was not newly discovered evidence; that it was only cumulative or corroborative of the testimony given by the defendant as a witness on his trial before the jury; and that, in the opinion of the judge, the defendant had not proven an overt act on the part of the deceased as a basis for the introduction of evidence that previous threats had been made by the deceased.
The testimony attached to the bill of ex *706 ception discloses that the victim of this tragedy, Nathan D. Pailet, was the defendant’s father, and that Miss Fannie Pailet and Mrs. Annie Pailet Gerson, the .wife of Abraham Gerson, are the defendant’s sisters.
Mrs. Gerson testified on the trial of the motion for a new trial that she went to her father’s home on the evening before he was killed, and found him very much provoked; that she asked him what was the matter, and he replied that he was disgusted and was going to take Herman’s life, saying “that it was either one way or the other -between them; that he would either kill himself or the boy;” and that Herman (the defendant) passed through the stable where the witness and her father were talking, and stopped and listened to the conversation. She repeated more than once, and the fact is not disputed, that the defendant heard the conversation between the witness and her father. She testified that, although she visited the defendant in the prison twice before the trial and discussed the case with him, asking him if his plea would be self-defense, and although she attended the trial during several days, she felt very bitter towards her brother, and did not tell him that she had heard the threats made by her father until after the trial. The latter statement is of no importance in view of her admission that the defendant had heard the conversation in which the threats were made, and knew tnat she had heard them, if they were really uttered. In the statement signed by Mrs. Gerson two days after the killing it is recited that the defendant went to her store at about 8 o’clock on Monday evening, the day before the killing, and said “that he was tired with life, as things never went right .with him, that he was going to end all, and that it would be all over Wednesday.” It is recited that the witness asked the defendant if he meant that he was going to kill their father, and he replied, “Well, if you think so, all right, if you take it that way,” and that the witness knew, when the defendant said “end all,” that he meant their father, because the defendant had often threatened to kill the whole family. Mrs. Gerson’s explanation of the statement she signed two days after the killing is not at all satisfactory. She testified that she was very nervous and excited when she signed the statement, and did not know what she was doing; that she did not remember that her brother had ever threatened their father, and did not remember the statement she signed two days after the killing. To a number of the questions propounded to her on cross-examination her answer was: “I do not remember.”
With due respect for Mrs. Gerson’s sympathy for her brother, we are convinced that the only feature of her testimony that was “newly discovered,” or discovered after the conviction of her brother, was the fact that she would consent to testify that her father had threatened her brother’s life. We are also convinced that her withholding from the defendant and his attorneys until after his conviction the information that she would testify that her father had threatened her brother’s life was not due to a feeling of bitterness on her part. She had no information to conceal from the defendant, because, if she heard the threat, the defendant knew she heard it. Our conclusion is that the district judge was justified in holding that the defendant did not exercise due diligence with regard to the testimony of Mrs. Gerson, and that it was not to be regarded, after the conviction, as newly discovered evidence. We
refer to the last two sentences in the opinion rendered in State v. Vige, 137 La. 130, 68 South. 383.
Abraham Gerson and Miss Fannie Pailet both testified to what Nathan D. Pailet said to the defendant, in the presence of both witnesses, in the kitchen, about an hour or *708 an hour and a half before the killing. Abraham Gerson’s version of the occurrence is that “the old man was fussing with Pailet, and said one must get out of the house;” that the elder Pailet applied vile epithets to his son, and the latter replied that he would leave the house if the father wished it, “and then the old man threatened him; he said he must get out from the house, that’s all;” that he would put an end to himself or the defendant; “one must get out.” The witness swore that he had not told the defendant “about having heard these threats” until after the trial, because he had felt so bitter against him. He admitted, however, that he had visited the defendant in prison twice before the trial, took apples to him, and wept when the verdict was rendered. As other reasons for not having testified to the alleged threats on the trial, Mr. Gerson said his health was bad, and he “did not want to mix up in such a business,” and, besides, that he had three children, was not a rich man, and had no time to waste. These were not very cogent reasons for Mr. Gerson’s unwillingness to testify to the alleged threats. He could not have given a better reason for not telling the defendant “about having heard these threats” than that the defendant was present when the threats were made, and knew the witness heard them, if they were really uttered. As in Mrs. Gerson’s case, the only feature of Mr. Gerson’s testimony that was “newly discovered” after the trial was that Mr. Gerson would so testify. His being qualified- to furnish the testimony was not newly discovered.
Miss Fannie Pallet’s version of what occurred in the kitchen is that her father and brother and brother-in-law, Abraham Ger-son, were all quarreling. But she did not testify that her father threatened to take the defendant’s life. She said:
“My father and brother Herman and brother-in-law were quarreling together, and my father said that either one would have to get out or something would happen. * * * ‘If one of us does not get out of here, somthing will happen.’ * * * ‘Either of us will have to get out of here,’ meaning himself or Herman, ‘or something will happen.’ ”
The witness testified that her brother, Herman, did not say anything during the quarrel. The killing occurred in a stable on the premises about an hour or an hour and a half after the alleged quarrel. The witness testified that she did not visit her brother in prison, and did not tell him or any one else that she had heard the quarrel in the kitchen, until after her brother was convicted. But it is not contended that the defendant did not know that his sister was present and heard the quarrel in the kitchen. Therefore it does not appear that the existence of the evidence proposed to be given by Miss Fannie Pailet was discovered by the defendant after his conviction; and the testimony tendered is of little or no importance.
It is not necessary to consider the other reasons assigned by the district judge for refusing to grant a new trial. We fail to find any error in the proceedings had in this case. The verdict and sentence appealed from are therefore affirmed.