PROVOSTX, J.
The two accused, Felix' Birbiglia and Charles Zalenka, murdered a young woman at a lonely spot on the outskirts of this city after nightfall while they and she were joy riding in an automobile. They shot her with a pisiol, and beat her on the head with it, and threw her body down an embankment into soft mud, thinking that it would sink and disappear.- Their motive was robbery of valuable jewelry she usually wore. They had planned the crime before starting out on the ride. A third young man, named Burns, was driving the automobile. He was a cousin and friend of Zalenka, Jrat may have been ignorant of the intentions of the other two. The car was one'which he operated on the streets for hire, as an employe of its owner; and certain it is that Birbiglia paid him for its hire the amount which would have to be accounted for to its owner for the time occupied by the ride. As soon, as .the other two left his car, he went to his father, a police officer, and told of the crime. The other twq were immediately arrested; and when, brought to the office óf the superintendent of police freely confessed. The jewelry was found where Birbiglia said he had hidden it; and all the other attending circumstances cropping out of the confessions were verified, and they corroborated the confessions. From these confessions it appeared that the crime was planned, and that the pistol was handed to Birbiglia by Zalenka at the moment of the shooting, and that Birbiglia did the shooting and the beating.
Birbiglia moved to quash the indictment, on the ground that only nine jurors were present when it was found. The contention is that all 12 of the grand jurors must be present at the finding of ah indictment. The contrary was held in the cases of State v. Pailet, 139 La. 697, 71 South. 951, Ann. Cas. 1918A, 102, and State v. Walker, 137 La. 197, 68 South. 407. We find no occasion to re-discuss the question.
The same accused moved for a change of venue on the ground of prejudice against him hi the public mind, created by the newspaper publication of the confessions and of the details of the crime, and by the newspaper comments. Much evidence was taken in that connection. It satisfied the 'learned trial judge, and satisfies us that a fair trial could he had. We see no reason for rehashing this evidence, which is practically all one way.
Zalenka and Burns moved for a severance, on the grounds stated in the motion as follows:
“On motion of Charles Zalenka and Robert Burns, defendants herein, through Ulic J. Burke, their attorney, and on suggesting to the court that movers have been jointly indicted for the crime of murder with the other defendant, Felix John Birbiglia; that their defenses are antagonistic to those of the other defendant; that the confessions obtained by the. police from- the defendants herein incriminating each other, and designed to' be used in evidence against movers on the trial of the *9 ease, would he greatly to their prejudice; and on further suggesting that movers desire to sever from the other defendant in this case in the defense thereof, and to have a separate trial.”
The court denied this motion for reasons stated as follows;
“Per Curiam. The sole ground urged for a severance was based upon the contention of counsel that the state would introduce confessions of the defendants which were antagonistic, 'and the reply of the district attorney that the confessions to be used wore not antagonistic, but, on the contrary, were' corroborative of each other. In my opinion, there was nothing in the confessions introduced on the trial of the case which entitled the defendant to. a severance.- Nothing was before the court to show whether the defendants would testify in their own behalf, or what their sworn statements, if they did so testify, would he.”
On the day of the trial, just before entering upon the trial, the state applied for a severance as to Burns, and it was granted.
Birbiglia complains that the ordering of this severance thus on the threshold of the trial, after it had been at one time opposed by the district attorney and refused, took him by surprise, and has operated to his prejudice, by practically depriving him of the benefit of the testimony of Burns, who without the severance would have had to take the stand as a witness in his own behalf, and thereby subjected himself to cross-examination, when “from his unwilling lips could have been wrung the true story of the crime.”
IVe are referred to- no law by which the discretion of the court in granting a severance on application of the state is in any way limited, and we know of none.
As to Zalenka’s motion for a severance, the allegations of fact contained in it were not sworn to, and therefore the facts therein alleged were not established as facts even priina facie. State v. Simon, 115 La. 732, 39 South. 971; 16 C. J. 788. So that the judge was at entire liberty to disregard them. Moreover, it does not suffice in such a motion to allege in general terms that the defenses are antagonistic. The facts should be stated so as to enable the judge to ascertain whether the antagonism is such as to necessitate a separate trial. No evidence was offered on the trial of this motion. The judge in passing upon it had to base himself upon such knowledge as he had derived from the confession theretofore made by Birbiglia; and, judging from that confession, there was no intention on th'e part of Birbiglia to shift the responsibility for the crime to Zalenka. In this confession Birbiglia had retained to himself full responsibility. Our learned brother was therefore well founded in his ruling.
But on the trial eacli of the two accused, testifying in his own behalf, did endeavor to exculpate himself as far as he could at the expense of the other; and hence their defenses did eventually prove to be antagonistic.
Under these circumstances, we are of the opinion that, upon a proper showing, timely made, for a severance before the trial which is to be hereafter had, a severance should in fairness be granted. Our reason for so holding is that in the confessions made in the office of the superintendent of police each of the accused implicates his associate ¡-in the crime, so that the confession of each of them will condemn the other, unless the jurors are able to liberate their minds from the impression which the confession cannot fail to have made., And as stated by the juror McEee on his voir dire (hereinafter to be referred to) “that is a rather difficult thing to do.” A trained mind may, no doubt, divest itself of a conceived- notion, but the average juror cannot so well do so, especially where the impression is deep, as in a case of this kind.
In State v. Taylor, 45 La. Ann. 606, 12 South. 927, this court said:
“The principle is clearly laid down by the text-writers on the subject, in a number of authoritative decisions, that the defendants can *11 not claim separate trials as a matter of right, although they sever in their pleas, but that the court, in its discretion, may allow them to be tried separately.
“There are exceptions to the rule. One, for instance, where one joint defendant has made a confession implicating both, and which the prosecution intends to offer on the trial.”
In State v. Lee, 46 La. Ann. 62S, 15 South. 159, this court said:
“It is proper for the judge to grant a severance in case the confession of one jointly indicted may implicate both — in case the prosecution intends to'offer same on the trial.”
In State v. Desroche, 47 La. Ann. 655, 17 South. 209, this court said:
“When * * * the defenses of each are antagonistic, and the confession of each, designed to be used, incriminates the other, we think the case for a severance is presented; otherwise each is tried by illegal evidence, the confessions being used.”
In State v. Duplechain, 136 La. 391, 67 South. 175, the court said:
“As no confession was offered, the appellants were not prejudiced by the overruling of their motion for a severance.”
In State v. Bessa, 115 La. 264, 38 South. 985, where the accused were jointly indicted for a crime one or the other of whom had committed, and the defense of each was that the other was the guilty party, this court directed that a severance be granted, simply because the defenses were antagonistic.
The general rule, no doubt, is that the granting of a severance is a matter within the discretion of the trial judge; but the ■rule is not without exceptions, as appears from the foregoing.
True, in State v. Johnson, 116 La. 865, 41 South. 117, this court incidentally remarked that the reason for allowing an exception to the said rule in a case where the confession of one defendant implicating another was intended to be used “would seem to have been removed by the passage of Act 1S5, p. 355, of 1902,” fixing the qualification of witnesses. But because the accused and his codefendants may testify does not obliterate from the minds of the jurors the deep impression which the confession of one of the accused may have made implicating his co-accused.
In the formation of the jury, our learned brother belo-w, usually so judicious, went to the very verge of legality, if, indeed, not overstepping it, in some of his rulings upon the competency of jurors challenged for cause as entertaining an opinion so fixed that a good deal of evidence would be required. to change it. See State v. Guillory, 146 La. 434, 83 South. 754, and State v. McCoy, 109 La. 682, 33 South. 730. We do not pass definitely upon these rulings, as a point is presented in the case upon which we are clear that the verdict must be set aside, and a new trial ordered; and as the law relative to the competency of jurors has been heretofore so thoroughly expounded in the cases supra, and many others, that for the purposes of the new trial there can be no necessity. of any further expounding.
A point not considered in those eases, however, and which may come up again on the new trial, arose in the course of the examination of the juror McEee on his voir dire as follows:
“Q. Now, Mr. McEee, under the law, the judge will instruct you that, where two or more persons are jointly indicted, the confessions of one, made after the termination of. the murder, implicating others, are admissible only against the person making the confession. You understand that?
“A. I get the idea; yes; it’s news to me.
“Q. Could you eliminate from your mind the confession of one of the defendants so far as it implicates the other defendants, and consider it only as to the one who made it?
“A. I think that is a rather difficult thing to do when they are together.
“Q. Suppose that the court instructed you that that was the law, and any confession one of the defendants may have made, implicating the other, you must disregard that confession and apply it only to the one who makes it. Could you totally disregard that as to the other defendants?
*13 “Mr. Lúzenberg: We object on tbe ground counsel should not be permitted to ask hypothetical questions based on - what may or may not be offered in evidence.
“The Court: I think that is a line of examination which is objectionable as going into the possible evidence that will be introduced in the case, and requires the juror in advance to state what he would do in regard to this particular evidence.
“Mr. Burke: Does your honor rule that the question should not be asked?
“The Court: Yes.”
This ruling was correct. The question was as to the ability of the juror, in considering the case of one of the accused, to disregard whatever impression the confession of the other accus'ed might have made upon him. The question addressed itself, not to the con-, clition of the mind of the juror touching bias or prejudice or opinion formed, but to the sufficiency of his intellect for weighing the evidence. No doubt a juror, sworn on his voir dire, who apparently is not intelligent enough to serve, may be questioned for testing his intellectual qualification. But this is evidently unnecessary and a useless waste of time in the case of a juror as intelligent as this juror McFee had already shown himself to be.
The confessions made in the. office of the superintendent of police were in response to questions propounded by that officer, and the questions and answers were taken down' by a stenographer as the same were being made. When they came to be offered in evidence, the accused Birbiglia objected, on the ground that they had not been taken down in their entirety. The facts in that connection are that there would be interruptions in the examination of the accused- in the superintendent's office, and that during these interruptions conversation would be carried on having no bearing upon the crime, and that it is this irrelevant conversation which was not taken down; that the confessions were taken down in their entirety. Evidently, therefore, this objection to their being admitted was without foundation.
The stenographic report showed that Birbiglia and Zalenka were first examined out of each other’s presence, and then in each other’s presence, and that then Zalenka was taken out and Burns was brought in, and that the following was what occurred while Burns was in the office:
“Q. (to Burns). Do you know this man (indicating Birbiglia) ?
“A. No, sir.
“Q. Ever see him before?
“A. I never did see him- before.
“Q. Is that tbe man got in your machine to-night?
“A. Yes, sir.
“Q. Who did he get in the machine with?
“A. Some girl.
“Q. Who else?
“A. A fellow was in my machine already.
“Q. AVhat is your cousin’s name?
“A. Zalenka.
“Q. Charles Zalenka?
“A. Yes, sir.
“Q. (to Birbiglia). Do you know this man (indicating Burns) ?
“A. I met him on several occasions.
“Q. Did you meet him last night?
“A. Yes, sir. I have seen him before.
“Q. Is this tbe man who was driving the machine and left the Maison Blanche last night?
“A. Yes, sir.
“Q. AYko was in your car with him when you got in the. car ?
“A. His cousin, Charley Zalenka.
“Q. Who did you get in the car with?
“A. A lady.
“Q. Is he the one who was driving the car?
“A. Yes, sir.
“Q. He is the one who Zalenka went over and talked to about taking this woman out, knocking her off foi; her diamonds?
“A. Yes, sir.
“Q. It was all understood, and he knew all about it?
'“A. Yes, sir.
“Q. He drove the machine?
“A. Yes, sir;i I wasn’t there when the conversation between him and Charley Zalenka took place; Charley told me he told him he was going to -take this woman out and knock her off for her diamonds.
“Q. He was on the front seat with Zalenka?
“A. Yes, sir.
*15 “Q. Zalenka handed you the gun from the front seat to the back seat, and you took it in your right hand and shot her?
“A. Yes, sir.
“Q. After she was shot, who helped you take the woman out of the machine?
“A. Charley Zalenka.
“Q. Whore was the gun then?
“A. I can’t exactly say.
“Q. You didn’t have him covered with the gun ?
“A. No, sir.
“A. (by Burns). He had the woman by the arm, dragging her and the gun in the other hand.”
(Zalenka was brought in the office.)
“Q. (to Zalenka). Zalenka, who helped this man drag that woman out of the machine?
“A. I did.
“Q. Where was the gun then?
“A. I don’t know where the gun was.
“Q. This man (Birbiglia) didn’t have the gun?
“A. No, sir.
“Q. You didn’t have ■ him covered with the gun?
“A. No, sir.
“Q. (to Burns). What about it, Burns?
“A. Birbiglia had the gun.
“Q. (to Burns). You heard Zalenka state that he helped this man to drag the woman out of the ear and throw her in the swamp?
“A. Ho is tolling a lie; I did see him'drag her.
“Q. (to Zalenka). You did help him drag her out?
“A. Yes, sir.
“Q. And Birbiglia didn’t have you covered with the gun?
“A. No, sir.
“Q. Did you have any conversation with this fellow (Burns) before this man and this woman got in the car?
“A. No, sir; never said anything to him at all.
“Q. Where did you get out of the ear with this man (indicating Birbiglia) ?
“A. On St. Andrews and Dryades.
“Q. Did you go into the house with him?
“A. Yes, sir.
“Q. AVent into his house?
“A. Yes, sir.
VQ. You were good friends, then; you didn’t have any trouble?
“A. No, sir; never said anything to each other.
“Q. When Burns left you, was there any trouble with him?
“A. No, sir.
“Q. (to Burns). This man (Birbiglia) paid you $0 for driving the car?
“A. Yes. sir.
“Q. AAho was it told- Corporal Burns about this shooting?
“A. (Burns). I went up and got him.
“Q. After you went up and got him, what did you do?
“A. 1 wont to Birbiglia’s house first.
“Q. What conversation did you have?
“A, I never had none; we didn’t get out of the car.-
“Q. How did you get him out?
“A. Blew- the horn.
“Q. And he came out?
“A. His pa came out first.
“Q. Then what happened?
“A. AVc told him to got in the ear.
“Q. Then where did you go?
“A. AVent to this fellow’s house (indicating Zalenka).
“Q. Then what happened?
“A. Brought him to the station.
“A. (by Birbiglia). lie came up to my house before; after he left us oil St. Andrews and Dryades, about 15 or 20 minutes later,- or half a hour or so, he came up with- Charley’s father, Burns did, with Charley’s father and another fellow. I was behind the counter at the time. Charley ho left about five minutes before to come down and see Burns, and Burns walked into the saloon. I was behind the bar, and walked outside with him, and he got back into the machine, and he said ‘AVhei-e’s Charley?’ and I said, ‘I think he went down town to see Burns,’ and I said, ‘Why, what’s the trouble?’ and he said, ‘His mother is very sick; I want to see him;’ and I said, T think that’s where you can catch him;’ and he went off. An hour or so later he came back again; that is, I was called out' of bed, and I came down stairs.
■‘Q. AVho vías with him then?
“A. AAhen Burns came there the second time ?
“Q. No; the-first time.
“A. Charley Zalonka’s father and another young man.
“Q. (to Burns). AAho was it?
“A. My brother Edmond.
“Q. (to Birbiglia). Did your father know-then about this shooting?
‘,‘A. I don’t know'.
“Q. (to Burns). AA’ho did you tell first?
“A. Zalonka’s father.
“Q. AVhat did you tell his father?
“A. I told him to go to Charley; he had hired a car and went out and shot a woman.
*17 “Q. That he hired a car and shot a woman?
“A. Yes, sir.
“Q. He’s what relation to you?
“A. Cousin.
“Q. When did you toll your father about it?
“A. When I went up with Charley’s pa, I brought him back home, and I went up and told my pa about it.”
This stenographic report was read to the jury by Air. O’Hara, the assistant district attorney. When he reached the point where Burns was brought in, the following- occurred:
‘"Air. O’Hara: At this point, if your honor please, Zalenka was taken out of the office, Burns was brought in the office, and Burns made a statement in the presence of Birbiglia. Now, if Air. Byrnes wants to read—
“Air. Byrnes: I certainly think it all ought to be read.
“Air. Burke: AVe object to any statement going to the jury that was made by Burns. Burns is a defendant here charged, and if the state desires to use Burns as a witness, he is “here in the city of New Orleans, and can easily be procured.
“Mr. Luzenberg: I think that it is admissible against Birbiglia if Birbiglia’s counsel insists upon it, but it is not admissible against Zalenka.
“The Court: This is Burns’ statement?
“Air. Luzenberg: Yes, sir. I think what Birbiglia says is admissible. What Burns says is not admissible.
“Air. Burke: I represent Air. Burns as well as Zalenka — that is why I object to anything he said.
“The Court: Burns is not on trial.
“Air. Burke: If the state desires to use Burns, lie is here in the city.
“Air. O’Hara: We are not going to use Air. Burns.
“Air. Burke: If Air. Byrnes desires to use Burns he is available.
“Mr. Byrnes: If your honor pleases, here is tire situation: On the morning of the trial, Burns is severed, it is in the record, a severance is ordered, and he is taken out of the case, and here lie is present, and most important' things are being said, things which will explain many things in that statement, and yet, in the continuous whole of that statement, when we reach the point at which Burns is brought into the room, they step in and let him out of the ease, and he is a cousin of Zalenka.
“Mr. Burke: I don’t know what the statement is, or what it purports to be, but I simply object to it.
“Air. Luzenberg: They were all present, and if Air. Birbiglia’s counsel insists upon it, I think it ought to go in, with the instruction that it should. not be considered as against Zalenka or Burns.
“Air. Byrnes: We are not insisting upon any part of the confession being read, but if that part is road the whole ought to be read.
“The Court: The court rules that counsel for Birbiglia is entitled to have this portion of the confession read — that if part of the confession is read, he is entitled to have the whole confession read, and the court further, in this connection, instructs the jury that any part of this statement that -refers to Zalenka should not be considered by the jury as against him at all unless made in his presence.
“Air. Burke: I reserve a bill of exception, making the question and answers of Burns a part of the bill, and at this time, mgy it please the court, I want to request the jury to be instructed not to consider that portion of Birbiglia’s statement, made in the presence of Zalenka, as referring to Zalenka, and that it be 'considered only as against Birbiglia. In other words, we contend that a confession made by one of the two defendants, whether the confession is made in his presence and hearing,' is not admissible against th( codefendant, but must be considerco b; the.- jury against him who made it.
“The Court (to the jury): A statement made under those conditions, where both persons are present, and where the statement implicated or refers to the other person, who remained silent and makes no answer at all, that cannot be used against him at all. Of course, if he takes part in the statement and admits the truth of it, or shows he understands it, and does make answer, why then it can be used, but his more silence cannot be used against him at all.
“Air. Burke: I understand your honor to mean by that that only that part of the statement of Birbiglia that was acknowledged by Zalenka is to be considered against him, and the part that he denies is not to be used against him.
“The Court: Exactly. Any part he denies, or any part about which ho remains silent. He had a perfect right to remain silent.
“Air. Luzenberg: AVe don’t think that the jury ought to consider that, ‘He is the one that Zalenka went over and talked to.’ We think that ought not to be considered by the jury.
“The Court: I think that is evident; that ought not to bo considered.’-’
*19 (The portion above referred to and to be read is indicated by “Read,” and that- portion was read to the jury.)
“During the further reading the following occurred:
“Mr. Byrnes: You can stop there.
“Mr. Burke: This testimony is being read at the request of counsel for Birbiglia, and we contend that it is not within the province of the state or attorney for defendant to say to the gentleman who is reading the statement, ‘Stop there.’ We contend that the court ought to pass upon the question whether he is going to read it or not.
“Mr. Byrnes: I understand it is being read over my objection.
“Mr. Burke: The whole thing is being read over my objection, but I object to part of it being stopped at this particular point.
“Mr. Byrnes: I don’t object to it being read; I simply said, if you are doing it to oblige me, you can stop there.
“The Court: The court rules that counsel has no right to request the reading to stop at any particular point.”
And the entire report was read.
As Burns was not on trial, the statements made by him were not evidence except in so far as they had been acquiesced in by the accused, and converted thereby into admissions. In that regard, our learned brother ruled correctly. But he failed to observe that Zalenka had not acquiesced in any of the statements made by Burns. True, he was present at, and heard some of them; but, being under arrest, he had a perfect right to remain silent, so that his having, remained silent cannot be construed into an acquiescence. ’ Marr’s Crim. Juris, p. 662. And, in fact, even if he had not been under arrest, none of the statements were of such a nature as particularly to challenge contradiction in such way that remaining silent when they were made in his presence could be construed into acquiescence in them. The only one of these statements which was really damaging to him is the one where Burns said:
“I told him [Zalenka’s father] to go get Charley [Zalenka]; he had hired a car and went out and shot the woman.”
But in that statement Burns was merely asserting that he had made a certain statement to his father. Zalenka was evidently under no necessity of contradicting the assertion of Burns that he (Burns) had made a statement to his (Burns’) father, out of the presence of Zalenka. We think that the questions propounded to Burns and the answers made by him should have been excluded. The fact that Birbiglia made no objection to their being read, is unimportant. If the evidence was inadmissible in the case, Birbiglia’s failure to object to it, or even his request that it be admitted, could not make it competent. And it was inadmissible in the case, since, so far as acquiescing in tire said statements of Burns is concerned, the situation is the same precisely as to Birbiglia as we have just stated it to have been as to Burns. He no more than Zalenka acquiesced in the statements of Burns. Evidence competent as to one of several accused on trial is admissible even though incompetent as to the other accused; but evidence wholly incompetent in the case cannot be made so by the consent of one of the accused to its admission.
In stating hereinabove that there was a point made in the case upon which clearly the verdict would have to be set aside and a new trial granted, we had reference to the exception reserved to the following instruction of our learned brother below to the jury:
“Section 785 of the Revised Statutes provides that, ‘there shall be no crime known under the name of murder in the second degree, but on trials for murder the jury may find the prisoner guilty of manslaughter.’ In other words, in this state the law authorizes the jury to find a verdict of manslaughter on all trials for murder, and requires the court to so instruct the jury.
“ * * * If you find from the evidence that there was no provocation for the killing, the law of manslaughter would be inapplicable. The theory upon which you find a verdict of manslaughter is that the evidence in the case is applicable to the crime of manslaughter, and *21 if you find from the evidence that there was no provocation for the killing, a verdict of manslaughter would not be responsive to the evidence in the case.”
Taken as a whole, this charge means that the jury can find, for manslaughter only when the evidence justifies it. Such is not the law. They may find for manslaughter in the most unmitigated case of murder. State v. Kinchen, 126 La. 39, 52 South. 185; State v. Hicks, 113 La. 779, 37 South. 753. In State v. Brown, 40 La. Ann. 725, 4 South. 897, a case of unmitigated murder like the present, the judge refused to charge the law of manslaughter, because inapplicable to the facts of the case. He was reversed, because, regardless of what the facts of the case may be, the jury is authorized to find for manslaughter on a trial for murder.
Very true, in the case of State v. Parks, 115 La. 765, 40 South. 39, this court approved a charge in which the judge had said to the jury, “You can * * * bring in a verdict of manslaughter, provided you find that the evidence in the case justifies such a verdict;” and that this court said in State v. Clark, 46 La. Ann. 704, 15 South. 83, that “it was the duty of the judge to * * * charge that, if the evidence justified such a verdict, they could return it,” thereby implying that such a verdict could be returned only if the evidence justified it.
But in the latter case while giving utterance to that expression, the court stated the law’ to be that—
“It matters not what is the nature of the evidence; the law absolutely and without qualification gives to the jury the right to return a verdict of manslaughter on a trial for murder.”
The court failed to observe the utter inconsistency between the two enunciations.
As far as the Parks Case is concerned its effect would be to wipe out of the statute book section 7S5; for if manslaughter can be found only when the evidence justifies it, said section becomes a useless dead letter; since, without it, just as well as with it, manslaughter may be found in every trial for murder when the evidence justifies it. To that effect is the common law, where no such statute exists; and criminal trials in this state are required to be according to the common law in the absence of modifying statute.
The intention in enacting this statute may only have been to express the idea that juries may find for manslaughter in cases where at common law the crime would be murder in the second degree. But the wording is not so qualified. It is broad and sweeping:
“On trials for murder the jury may find.the prisoner guilty of manslaughter.”
As said in the Clark Case, supra:
“This law absolutely and without qualifica.tion gives to the jury the right to return a verdict of manslaughter on a trial for murder.”
Perhaps this statute should be modified, but so long as it stands as now written this court can but enforce it.
The judgment and verdict in this case are therefore set aside, and the case is remanded, to be proceeded with according to law.
O’KIELL, J., concurs in the decree.