Rehearing refused by Division A, composed of Chief Justice PROVOSTY and Justices OVERTON and LECHE.

(91 South. 664)

No. 24914.

STATE v. RINI et al.

(Jan. 2, 1922. Rehearing Denied Feb. 27, 1922.)

*(Syllabus by Editorial Staff.)*

1. **Jury** 🔑59(1)—**Commissioner is not disqualified by accepting office without taking oath.**

Though Act No. 135 of 1898, § 3, prohibits a person who holds any state, parish or municipal office from being a jury commissioner, and Act No. 136 of 1898, § 23, designates a town clerk as an officer, a man who had been elected or appointed town clerk and is acting as such was not an officer so as to be disqualified from acting as a jury commissioner where he had not taken the oath of office required by Const. 1913, art. 161.

2. **Criminal law** 🔑409—**Denials of officers who were in position to hear threats outweigh defendant's testimony they were made to secure statement.**

In determining whether a statement by defendant while under arrest was voluntary, a denial by several of the officers who were present and in position to hear what was said that any threats were made outweighs the testimony of defendant that such threats were made.

3. **Criminal law** 🔑522(3)—**Prior mistreatment not inducing confession does not invalidate it.**

The fact that officers who had defendant in charge had previously mistreated him does not render involuntary a confession made by him to another after the mistreatment had ceased, and which was not brought about thereby.

4. **Criminal law** 🔑406(3), 522(3)—**Confession or admission held not induced by prior mistreatment.**

Where defendant after his arrest was taken along by the officers in an automobile while they were searching for other suspects, and was struck by a deputy sheriff with a pistol and slapped by the sheriff as they were starting, a statement made by him after all of the officers except one had left the automobiles to search the woods, and which was made in response to an apparently friendly question by one who had not participated in the mistreatment, was not induced by the mistreatment, and was voluntary and admissible, whether it be regarded as a confession or merely as an admission of an incriminating fact.

5. **Criminal law** 🔑406(3)—**Evidence held to show statements to assistant district attorney were voluntary.**

Where one defendant requested a private interview with the assistant district attorney, and the latter stated that at the interview no threats or promises were made to induce that defendant to confess, but that he voluntarily made a statement containing incriminating admissions as well as exculpatory statements, which he later repeated in the presence of other defendants, his statements were voluntarily made and are admissible against him, notwithstanding his testimony that the assistant district attorney threatened him.

6. **Criminal law** 🔑406(5)—**State can offer exculpatory statement containing admissions.**

The state can offer in their entirety statements made by a defendant which on the whole were exculpatory and not confessions, but which contained admissions of fact which had a tendency to incriminate, in order to show such admissions, and not merely to show that defendant had made such a statement.

7. **Criminal law** 🔑406(2)—**Statement of one defendant in presence of others under arrest is not admissible against the others.**

Where one of the defendants repeated in the presence of the others, all being under arrest, a statement which he had previously made to the assistant district attorney, and the others either remained silent or charged the defendant making the statement with an attempt to save himself by putting in on them, and did not admit the truth of the statements, such statement is not admissible against any of the defendants except the one who made it, since the rule permitting statements made in the presence of the accused does not apply where accused was under arrest at the time.

**8. Criminal law** ⟨⟩**804(1)—Statute requiring written charge when requested is mandatory.**

Rev. St. 1870, § 28, providing that in all cases appealable to the Supreme Court the judge must deliver his charge in writing if either party requires it, is mandatory, and the refusal of the judge to comply with a request for a written charge is fatal.

**9. Criminal law** ⟨⟩**804(5)—Charge partly written and partly oral does not comply with request for written charge.**

The giving of a charge which was partly written and partly oral is not a compliance with the requirements of Rev. St. 1870, § 28, that the charge shall be given in writing if requested by either party.

**10. Criminal law** ⟨⟩**804(7)—Oral charge taken by stenographer is not equivalent to written charge.**

The statute requiring a charge to be given in writing when requested by either party was intended to secure a charge which was better considered and more clearly expressed than an oral charge would be, and it is not sufficient compliance therewith that a charge delivered orally was taken down by the stenographer as it was delivered.

**11. Criminal law** ⟨⟩**841—Exception to charge because oral made before jury retired is in time.**

Defendants did not waive their request that the charge be written by not making objection on that ground while the charge was being given, which would probably result in delaying the trial to their injury, where they did except to the charge at its conclusion and reserved their bill of exceptions thereto before the jury retired.

**12. Criminal law** ⟨⟩**792(3)—Instruction on constructive presence at offense held correct.**

In a prosecution of several defendants for murder, where the indictment charged a conspiracy, a charge that none of the defendants could be convicted as accessories because they were charged as principals, and that a man might be either actually or constructively present at the commission of a crime and was constructively present if, though not actually at the place itself, or near enough to give aid, he has done some act in furtherance of the common design without which the crime could not have been committed, was correct.

**13. Criminal law** ⟨⟩**778(5)—Charge on alibi held to place burden of proof on defendant.**

A statement in the charge on alibi that such defense, if established to the satisfaction of the jury, was legitimate and sufficient, was erroneous as placing the burden of proof on defendants.

**14. Criminal law** ⟨⟩**823(9)—Erroneous charge on alibi held cured by subsequent charge.**

An erroneous statement in a charge on alibi placing the burden of proof on defendants was cured by a later charge in the same paragraph stating that the burden rested on the state to prove the commission of the crime, and that the state must sustain its burden on every material issue involved.

**15. Criminal law** ⟨⟩**823(13)—Charge on right of accused to testify held not to single out his evidence.**

A charge that, when an accused person avails himself of his privilege of testifying, his evidence should be weighed by the same rules that apply to other witnesses, was not erroneous, though preceding that charge the court had charged that in weighing the testimony of all witnesses, their interest, if any, in the case should be considered, since the two charges together did not single out the testimony of accused.

Monroe, C. J., and Baker and O'Niell, JJ., dissenting in part.

Appeal from Twenty-Fifth Judicial District Court, Parish of Tangipahoa; Robert S. Ellis, Judge.

Joseph Rini and others were convicted of murder, and they appeal. Reversed and remanded.

Lewis L. Morgan, of Covington, George J. Gulotta, of New Orleans, Purser & Magruder and W. B. Kemp, all of Amite, and C. Sidney Frederick, of Covington (Chandler C. Luzenberg, of New Orleans, of counsel), for appellants.

A. V. Coco, Atty. Gen., and M. J. Allen, Dist. Atty., of Amite (Robert R. Reid and Amos L. Ponder, Sr., both of Amite, and T. S. Walmsley, of New Orleans, of counsel), for the State.

OVERTON, J. Joseph Rini, Andrea Lamantia, Roy Leona, Joseph Giglio, Joseph Bocchio, and Natale Deamore were convicted of the murder of Dallas Calmes, and from

sentence of death pronounced against them, appeal to this court.

[1] Defendants moved to quash the bill of indictment on the ground that Herbert Broyles, one of the members of the jury commission, which selected the grand jury that indicted them, was not, at the time of the selection of that jury, a member of the commission; that he had vacated his office as jury commissioner by accepting the office of clerk of the town of Kentwood; and that, as he had participated in the selection of the grand jury when he was no longer a member of the commission, the grand jury thus selected was an illegal one, and the indictment which they presented was therefore null and void.

As section 3 of Act 135 of 1898 prohibits a person who holds any state, parish, or municipal office from being a jury commissioner, and as section 23 of Act 136 of 1898, as amended by Act 97 of 1900, under which Kentwood is governed, designates the clerk as an officer, and as the nature of his duties makes him one, the question therefore presents itself: Has he qualified as clerk? We are of the opinion that he has not. Article 161 of the Constitution of 1913 requires all officers, before entering upon the discharge of the duties of their respective offices, to take the oath prescribed by that Constitution. This Broyles has not done. The taking of the oath is essential in law to an acceptance of the office. A mere acting as such officer is not sufficient, although the person so acting, as is the case here, may have been elected or appointed thereto. State v. Glaude et al., 148 La. 353, 86 South. 895. Hence the motion to quash the indictment is not well grounded.

On the trial the state called as a witness Robert Thompson, and sought to elicit from him a statement made in his presence by Natale Deamore, one of the defendants. All of the defendants objected to this statement on the ground that it was not freely and voluntarily made. The court overruled the objection, according to the recital of the bill, on the ground that the statement was voluntarily made. The court, in its per curiam, also says that it was not a confession, but was more in the nature of a self-serving declaration.

The facts surrounding the making of the statement are as follows: Deamore was arrested on the morning of the murder, and was taken to Albany. At Albany he was delivered to several deputy sheriffs, who had him get into an automobile for the purpose of delivering him to the sheriff. At that time Deamore was handcuffed, and there was a rope around one of his legs. From the evidence of the deputies, when Deamore reached the automobile, he acted as if he did not care to get in it, and turned aside, at the same time cursing. Hoggatt, one of the deputies, then hit him over the eye with a pistol, which caused a wound in Deamore's forehead of approximately an inch and a half in length, and which caused the blood to flow rather freely. At this time he was hit or shoved by one Tom McCarroll. Deamore's evidence is to the effect that he had no intention of not getting into the automobile, but that he had difficulty in doing so, because of the fact that he was handcuffed and his legs were tied. When he got into the automobile, he fell against a deputy, who shoved him to the other side of the seat. The deputies then proceeded on their journey to deliver Deamore to the sheriff. After driving some three miles and a half, they overtook him. Deamore expressed a desire to talk to the sheriff, and the sheriff questioned him. The exact time of this questioning, in so far as it relates to the statement objected to and made by Deamore, does not clearly appear. We gather, however, that it was within an hour prior to the making of that statement. During the questioning, the sher-

iff slapped Deamore, not because he would not talk, but because he answered questions in a roundabout way, instead of answering them "Yes" or "No," which the sheriff desired him to do. The party having Deamore in charge, after the sheriff joined them, proceeded along the road, apparently in search of others. They reached a point where the sheriff heard a noise in the bushes, and the automobiles containing the party were brought to a stop. Every one got out of the cars except the deputy in charge of Deamore and Leotta, another prisoner, and went into the woods a short distance to ascertain whether the noise was caused by one of the men for whom they were searching. In about 10 minutes the party returned to their cars. About that time a person named Pulliam approached the car in which Deamore was sitting and asked him where he was from. Deamore replied that he was from New Orleans, and, continuing, he said (to quote from the evidence of one of the witnesses):

"They got him [Deamore] to come with them to help. They told him it was only 50 miles. He said he did not want to come. He said, 'This is what they got me into, the dirty crooks,' and he said, 'Me go with you and help you catch them;' 'you ought to go up there and see where they killed a man.' "

[2] The record shows that no other question was asked him than the one above mentioned, relating to the place from which he came. At the time the statement was made the sheriff was some 40 yards off, and did not hear it. Hoggatt, who had hit him, was somewhere in the vicinity, though it does not appear that he was within hearing distance. There were several others present, among them, deputy sheriffs. Kemp, the deputy who had shoved him shortly before, at Albany, to the other side of the seat in the automobile, was sitting by his side, and perhaps also another person. No inducements or rewards were offered him there, nor at

any other time prior thereto, to secure a statement, nor was any duress used, but the statement was voluntarily made, unless the making of it was induced or compelled by his prior mistreatment above detailed. It is true that Deamore mentions in his evidence that the officers informed him at Albany that they were going to take him to some place and hang him, but each of these officers testified that he heard no threats made there, nor at any time prior to the making of the statement, and, as they were in position to know, their evidence outweighs his.

[3] The mere fact that officers have mistreated a prisoner who is in their charge does not make a confession made by the prisoner necessarily inadmissible as evidence, on the ground that it was not freely and voluntarily made. If the confession was not brought about by such misconduct, but voluntarily made, without the giving of hope that it would be to his temporal advantage to confess, or the offering of any reward, then the confession is admissible.

[4] Our conclusion is that, while Deamore was mistreated by the officers prior to the time he made the statement, yet the mistreatment did not cause him to make it, either by putting him in a state of fear or otherwise. Pulliam, to whom the statement was made, spoke to him kindly. He was in no way responsible for the mistreatment. While Hoggatt had hit him an hour and a half before, yet this was not done with the end in view of bringing about the making of a statement. When the sheriff slapped Deamore, the latter had asked for the interview in which the slapping occurred, and the slapping was attributable only to the indirect manner in which Deamore answered questions, and was, to his knowledge, not intended to elicit any particular answer.

While such misconduct on the part of officers may put a prisoner in fear, and thereby bring about the making of a confession,

which would be inadmissible, yet we do not think that the statement was made because of fear arising from such misconduct. In our view that which caused Deamore to make the statement was that he was under arrest for the crime, and he, of his own motion, and without any offer of hope or clemency from any one, sought to extricate himself from his difficulty by tendering assistance to the officers. The motive for making the statement appears from the statement itself, wherein he condemns those who got him into the trouble, and offers to assist the officers in finding them. Therefore, finding that the statement was freely and voluntarily made, it was admissible as evidence, whether it be considered as a confession or a mere admission of certain facts, tending to incriminate, but falling short of a confession of guilt, or whether it be considered as a mere exculpatory statement.

Deamore, and some of the other defendants, those apparently under arrest at the time, were promptly taken to New Orleans for safe-keeping, where Deamore on the morning following his statement to Pulliam made a statement to Mr. Craven, an assistant district attorney of the parish of Orleans, which statement, according to the latter's evidence, is as follows:

"He told me that on Friday, May 6th, five men, whom he termed 'five crooks,' came to his place of business in an automobile and told him that they were going out into the country, up into the country, and that they wanted him to go along as a mechanic. He said the men knew him. He said that he had been a scissors grinder around New Orleans, and had finally become the owner of a garage, and that he was a good mechanic, and that they wanted him to go along as a mechanic. He says he drove up the road to a place belonging to a man by the name of Peter Leotta, and that Deamore asked him to show them the road to Independence. Leotta, he said, told them that he would go along with them and show them the road, and that he had a little boy working for some one near Independence, at the place of a man by the name of Giamalva, and he wanted to take him along with them when they came back, and that they agreed to do this. He said when he got to Giamalva's he went in the pasture and put the car up, and that there was some woods back of the pasture, and he turned the car around back of the pasture; that some time during the day, while at Giamalva's, some of them took him out in the woods and threatened him with a gun and told him that if he said anything about this that they would kill him; that later on they went to Giamalva's and asked Giamalva to lend them a horse and wagon, and that Giamalva told them he didn't have a horse and wagon, or didn't care to lend them one, and that they went across the way in the vicinity and asked a man by the name of Pisciotta for the loan of a horse and wagon; that Pisciotta lent them a horse and wagon, and that the men drove into Independence to purchase gasoline and came back to Giamalva's house later on; that night, I think he told me it was 11 o'clock, the men left Giamalva's house and started towards Independence; that he went along with them; that on the way to Independence, between Independence and Giamalva's house, Deamore told me that the men ordered him to get out of the automobile alongside of the railroad track; that he got out of the automobile alongside of the railroad track, where he found four guns, and took two of them with him; that he was walking towards the station when he was arrested. He said that he didn't know that the men were going on there on any criminal business, and did not find out till later that they were criminals. I asked him if there was any other gun or guns in the automobile. He said 'Yes.' I said, 'Did you see them?' He says, 'I hit them with my foot while riding in the automobile, and they told me to watch out for those guns.' I asked him, 'Was anything else in the automobile?' He says that there was a package in the automobile. That's about all I can remember just now."

This statement was objected to on the ground that it was not freely and voluntarily made, but that the making of it was induced by violence, threats, and the moving of Deamore from one police station to another.

Craven testified that he did not seek the interview in which the above statement was made, but that it was asked for by Deamore, who made the request that it be private. The evidence of this witness is also to the effect that, in so far as his knowledge extends, no threats were made, nor duress used,

nor was any hope given to induce the making of a statement or confession.

Deamore, as a witness in his own behalf, testified that he was taken to the morgue, and while there Craven pointed out to him two men who were there lying dead, and whom Craven said he had killed, and that, unless he (Deamore) confessed, that he would treat him likewise. Two of his codefendants who accompanied him also testified as to threats against them on that occasion and as to other mistreatment.

While Craven did not recall whether Deamore had been taken to the morgue, yet he felt that he had been. He recalled having taken two of the other defendants. Two detectives who were with Craven when the visit was made both testified that Deamore was taken there with the others. The evidence of all three is to the effect that no threats were made against any of the defendants; that the purpose in taking them there was to identify two Italians who had been killed the night before.

[5] As to whether the statement was voluntarily made depends upon whose evidence should be accepted. Deamore did not recall whether he made the statement or not, but does not deny having made it. A careful review of the evidence leads us to the conclusion that it was voluntarily made, and, having been thus made, there can be no question that the objection urged against its admissibility was properly overruled.

On the afternoon of the same day that Deamore made the above statement to Craven, in private, the latter had Giglio, Leona, Rini, and Lamantia brought into a room where he and Deamore were; and, at Craven's request, Deamore repeated to them that statement. Rini remained silent. Giglio said, referring to Deamore: "He is trying to get out of it himself." Leona said: "He is trying to get us in it and get himself out of it." Lamantia sprang at Deamore, but was prevented from striking him.

When the statements made by Deamore to Craven in private, and in the presence of the defendants mentioned, were offered in evidence, the defendants Joseph Rini, Andrea Lamantia, Roy Leona, Joseph Bocchio, and Joseph Giglio objected to them on the ground that what was stated out of their presence was not binding on them nor evidence against them, and that as to Deamore himself, the statements were made under duress and after threats and violence; and the defendants also asked the court to then and there charge the jury that the statements, if any were made, could not be considered substantive evidence, but only evidence that Deamore had made them. The court overruled these objections.

[6] We are of the opinion that the evidence shows that the second statement made by Deamore in Craven's presence was voluntarily made. In so far as concerns Deamore, the court below did not err in admitting both statements as substantive evidence. While the statements upon the whole are exculpatory and not confessions, for Deamore did not admit his guilt, nor his criminal agency in the commission of the crime, yet they contain admissions of fact which have a tendency to incriminate. The state, therefore, had a right to offer both statements in their entirety against Deamore, in order to show these admissions for their probative value; and Deamore had no right to expect that they should be received merely to show that he made them, and for no other purpose.

The remaining defendants, however, asked that the statements be received as to them, not as substantive evidence, but as mere statements made by Deamore, if made by him at all. The court overruled this, and, as appears from the stenographic notes made at the time, charged the jury as follows:

"At the present time I will let the matter stand as charged in the previous charge at the request of the defendants. I have only charged

the jury that the testimony relating to statements made by Deamore to Mr. Craven will apply only against Deamore, and not against the other defendants, *who were not present at the time.* The court will take care of that under general instructions." (Italics ours.)

As the court in the above ruling refers to previous instructions, it may be well to observe that, when the witness Thompson was on the stand, giving his evidence as to the statement made by Deamore to Pulliam, a similar request was made by the defense, but the state objected. The court then reserved the point for the general charge. When Pulliam was on the stand testifying to the same statement, at the request of the defendants, the statement was confined as to its effect against Deamore, and instructions were given to the jury not to consider it against the other defendants. That instruction, it may be noted, conflicts with that given to the jury and set forth in the bill under consideration. When Wing was on the stand, giving his evidence not only as to statements made by Bocchio, another of the defendants, but also as to the statements made by Deamore, in the presence of Craven and several of the defendants, and which prompted the requested instruction now under consideration, the court was then asked to receive them as against Bocchio only. The court, however, instructed the jury as follows:

"*Any statement made by any one of the defendants* out of the presence of the other defendants is only to be considered by you gentlemen, against the particular party making the statement. *If it was made in the presence of any other accused, you can give it whatever effect you think it should have.*" (Italics ours.)

From the above we conclude that the statements made by Deamore went to the jury as substantive evidence against those of the defendants, who were present when they were made. This, in so far as we are able to see, was the only purpose that the state had in offering them, for they were a mere repetition of what Deamore only a few hours before had stated to Craven in private, though we conclude that, if the state saw proper, it had the right to show, in so far as Deamore was concerned, that he made the same statement twice, and this we have held above, but this must be understood with the qualification, as we shall proceed to show, that when such evidence is being offered, the rights of the other accused must be carefully guarded.

[7] The statements were not admissible against the defendants other than Deamore. They had not admitted their truth, nor even the truth of anything in them. All were under arrest at the time. When the statements were made Rini remained silent. In State v. Carter, 106 La. 407, 30 South. 895, we said:

"But the accused, at the time the statements were made, was under arrest, and it is well settled that the exception by which uncontradicted statements are taken out of the rule excluding hearsay, does not extend to cases where the accused was under arrest when the statements were made. State v. Diskin, 34 Ann. 919; State v. Estoups, 39 Ann. 906."

In so far as respects the others, who were present, we see nothing in their replies or conduct that shows an admission of even a single fact; and nothing that would justify the admission of the statements against them, especially as evidence of the truth of Deamore's statement implicating them.

It is true that the defendants asked that, if the statements were not excluded because not made voluntarily by Deamore, then that they be received as against the defendants, not as substantive evidence, but only as evidence that Deamore had made such statements. If the court did not feel justified in excluding the evidence altogether, as relates to the defendants other than Deamore, against whom it was admissible, it should have limited the effect of it, as requested by those defendants. As the court did not do so at the time nor in its general charge, it

erred to the injury of Giglio, Leona, Rini, and Lamantia. As to Bocchio, it was shown that he was not present when the statements were made; and, as the ruling of the court excluded them as to those of the defendants who were not present at that time, he was not injured.

After the jury had been impaneled, and before any evidence had been offered, the defendants requested the judge to give a written charge to the jury. When the time came for him to deliver his charge, he did so, partly in writing, partly by reading marked passages from books, and partly orally. The entire charge was taken down in shorthand by a competent stenographer. The stenographer, at the instance of the defendants, had been sworn to take the evidence produced and the matter forming the bases of bills of exception throughout the trial. The defendants, at the conclusion of the charge, excepted to it, on the ground that it was not given entirely in writing.

The judge, in his per curiam, states that he had a general charge in writing, which he had used from the time he ascended the bench; that he used this, and also read from a work on criminal law; and he further says:

"I delivered a small portion of my charge to the jury orally, always cautioning the stenographer to be sure and get it correctly, and in a slow manner, so that he could, and which he did. It was impossible for me otherwise to give a complete charge, as I could not anticipate the arguments of counsel as to law quoted by them, and to know in advance just what was needed in the way of special explanations. Had the stenographer, who was employed by defendants, not been present, taking the charge in toto, I would have stopped, and, in the presence of counsel and the jury, have reduced the explanations and special charges given orally to writing before delivery; but having the stenographer, who is highly qualified and very accurate, present, I saw no necessity to delay proceedings when the effect was the same."

The judge then concludes by saying that the stenographic report of the charge is perfect; that, had he written it, it would not have been different from what it is.

[8] Section 28 of the Revised Statutes provides that:

"In all cases appealable to the Supreme Court, it shall be the duty of the judge to deliver his charge to the jury in writing, if the counsel of either party require the same."

The above statute is mandatory, and the refusal of the judge to comply with it by not giving a written charge, when requested, is fatal. State v. Porter, 35 La. Ann. 535; State v. Gilmore, 26 La. Ann. 599; State v. Swayze, 30 La. Ann. 1323.

[9] In the above cases the charge was entirely oral; whereas in this case it was only partly so. The fact, however, that part of it was written does not bring it within the statute. The law, in requiring a written charge, when requested, obviously means that it should be entirely written, and not partly written and partly oral. It is so held in other jurisdictions under statutes that require written charges, either without request or when request is made; and we are of the opinion that a similar interpretation should be given our statute. In fact, in our view, it will bear no other interpretation. People v. Payne, 8 Cal. 341; Walker v. State, 10 Ga. App. 85, 72 S. E. 531; State v. Potter, 15 Kan. 302; State v. Young, 111 N. C. 715, 16 S. E. 543.

Therefore there was fatal error in the manner in which the charge was delivered in this case, unless the fact that the court had it taken down by a stenographer while it was being delivered brought it within the statute, or unless the defendants waived their right to a written charge.

[10] In determining the first of these questions, it may be observed that the language of the statute imports that, when a request is made for a written charge, it must be in writing when it is delivered. The nature of one's case may be such that he may feel that more than ordinary precaution should be

used in charging the jury. Written charges are often better considered, more clearly expressed, and, in complicated cases at least, less likely to contain error. An oral charge, although when the judge is delivering it, he knows that it is being taken by a stenographer, is not so likely to secure these advantages. Therefore, for this reason, and no doubt for others, the law permits either party to the case to require that the charge be delivered in writing.

In other jurisdictions in which the judge is or may be required to deliver a written charge the weight of authority seems to be that a charge orally delivered and stenographically taken is not within the requirements of the statute. Lesueur v. State, 176 Ind. 448, 95 N. E. 239; Littell v. State, 133 Ind. 577, 33 N. E. 417; Burnett v. State, 72 Ark. 398, 81 S. W. 382; Brindle v. State, 17 Ga. App. 741, 88 S. E. 460; State v. Harding, 81 Iowa, 599, 47 N. W. 877; State v. Bennington, 44 Kan. 583, 25 Pac. 91.

[11] We are not of the opinion that defendants waived or lost the benefits of their right to a charge entirely written by not excepting until the conclusion of the charge. The bill was reserved before the jury retired. This was sufficient. The nature of the right conferred is such that for a defendant to seek to enforce it then and there would probably result in his delaying the trial, to his injury. To avoid that injury, resulting from the failure of the judge to prepare a written charge, he would have to forego his right to a written one altogether. The right is such that, when seasonably requested, the judge must grant it; and, if he should fail, an exception reserved at the conclusion of the charge, and before the retirement of the jury, is timely. An exception to the charge of the judge is timely taken, if reserved at its conclusion, and before the jury retires. State v. Wright, 104 La. 45, 28 South. 909; Marr's Criminal Jurisprudence, p. 794.

The case of State v. Outs, 30 La. Ann. 1155, is the only case in our jurisprudence, within our knowledge, that might be construed as militating against the above view. In that case the court held that the judge had complied with the request for a written charge, though, after delivering it, he made oral observations to the jury. No objection was made to the oral observations at the time, nor was any error pointed out in them. The court ruled that the judge had complied with the demand, "and, if there were any objection to his saying anything to the jury beyond what he had written, it should have been made then." It does not appear from the opinion, when the exception was taken; and therefore, as the opinion is vague in this respect, it is difficult to say whether the court meant to hold that an objection made at the conclusion of the charge was timely or not. An inspection of the record, however, shows that the charge was given to the jury partly orally and partly in writing, and that, after it was so given, no exception was taken thereto, and not until the bill was presented. Hence that case, neither from the face of the opinion, because of its vagueness, in that particular, nor from an inspection of the record, to clarify it, can be considered as precedent against the view that, when the exception is taken at the conclusion of the charge and before the jury retires, it is timely taken.

We therefore conclude that this bill was well taken and ought to be maintained. The judge had the right to read to the jury marked passages from the book mentioned by him, but not to charge partly orally.

[12] The judge, at the request of the defendants, gave a special charge to the jury defining principals and accessories, and instructed the jury that the accused were charged as principals, and not as accessories, and that, as they were not charged as accessories, no one of them could be con-

victed that the jury failed to find was a principal, though the jury should find that he was an accessory. The court, immediately after giving the special charge, added:

"Gentlemen, a man may be either actually or constructively present at the commission of a crime. A person who is actually present is a person who is near enough to give aid or assistance in the actual commission of the crime, or to aid in the escape of the party perpetrating the crime. A man is constructively present who, though not actually at the place itself or near enough to give aid, has done some act in the furtherance of the common design. A man may not be actually present, but he may be constructively present if he has done anything to put the design in such shape that without it the crime could not have been committed."

The defendants excepted to this charge on the ground that the court's instruction as to constructive presence was erroneous.

The indictment in this case charges a conspiracy. In the case of State v. Poynier et al., 36 La. Ann. 572, the indictment also charged a conspiracy. That case involved the larceny of cotton. The judge there, in charging the jury, said:

"If the evidence establishes a combination on the part of the accused and others to steal the 32 bales of cotton, and that Poynier, with the view of assisting the actual perpetrators of the larceny, kept out of the way, he was guilty as principal."

This court maintained the instruction as correct, and, in passing on the case, among other things, said:

"One need not be either an eyewitness of the criminal act or within hearing of it to make him a principal. If he had knowledge of it, and watches so as to assist in any manner, it is enough. (Doan v. State, 26 Ind. 495). Or if he do any act in execution of the common design, or to aid those who are immediately engaged to escape (Wixon v. People, Id.). Each person consenting to the commission of an offense, and doing any one act which is an ingredient in the crime, or immediately connected with or leading to its commission, is a principal. U. S. v. Wilson, Baldw. (U. S.) 78, 102

(Fed. Cas. No. 16,730); U. S. v. Libby, 1 Woodb. & M. (U. S.) 221 (Fed. Cas. No. 15,-597)."

We therefore conclude that, in so far as relates to constructive presence, the charge in this case is correct.

[13] The court also charged the jury that:

"Among the defenses in this case is what is known in law as the plea of alibi; that is, that the accused at the time of the commission of the crime of which they are charged were at another place, and wholly disconnected with it. Such defense, if established to the satisfaction of the jury, is legitimate and sufficient. Evidence offered to sustain the defense of alibi is in its nature rebuttal to evidence introduced by the prosecution. In judging the facts involved in this issue the jury must consider all evidence, as well as that brought by the accused as that brought by the state. The burden of proof rests on the state to establish that the defendants committed the crime with which they are here charged, and the state must sustain its burden on every material issue involved in the case."

[14] The court erred in inserting in the charge the sentence:

"Such defense, if established to the satisfaction of the jury, is legitimate and sufficient."

This sentence casts the burden of proof on the defendants. However, we think that the effects of the error were removed by the charge in the same paragraph, where it is said:

"The burden of proof rests on the state to establish that the defendants committed the crime with which they are here charged."

This instruction immediately follows as to how the jury should consider the evidence in support of the alibi, and therefore we conclude that the effects of the error were removed.

[15] The judge charged the jury that, when an accused person on trial avails himself of the privilege of testifying, his evidence should be weighed by the same rules that apply to other witnesses. Preceding that

charge, he also charged the jury, in giving the general instructions applicable to weighing the evidence of all witnesses, that:

"Whenever it happens that there may be conflicting testimony, the jury may consider whether or not any witness has any interest in the result of the trial."

The defendants excepted to this on the ground that it was equivalent to instructing the jury that they might take into consideration the interest that the accused had in the result of the trial, and cite in support of their contention State v. King, 135 La. 117, 64 South. 1007; State v. Smith, 135 La. 427, 65 South. 598; State v. Hataway, 144 La. 142, 80 South. 227.

The charge in those cases was objectionable, because the judge singled out the accused, by instructing the jury that they might consider the interest they had in the result of the trial. No such objection is applicable here. The court in this case did not single out the accused in giving the instruction, but the instruction applied alike to all witnesses without singling out one, whether he was one of the accused or not, and therefore was not improper.

The remaining bills of exception relate to the offering of evidence in rebuttal, the selection of the jury, and incidents surrounding the trial. It would serve no useful purpose to pass on them.

For the reasons assigned, it is ordered, adjudged and decreed that the verdict of the jury and the sentence based thereon be, and the same are, hereby annulled, avoided, and set aside, and that this case be remanded to the lower court to be proceeded with according to law and the views herein expressed.

MONROE, C. J., concurs in the decree, but dissents from the ruling upon charge of trial judge.

BAKER, J., concurs in the decree.

MONROE, C. J., and BAKER, J., concur in the ruling on the exception first sustained, but dissent from the ruling sustaining the bill reserved upon the question of character (whether written or not) of the judge's charge.

O'NIELL, J., concurs in the result, but is of the opinion that the confessions were not voluntary.