(112 So. 655)

No. 28402.

### STATE v. GENNA.

Feb. 28, 1927. Rehearing Denied April 25, 1927.

*(Syllabus by Editorial Staff.)*

1. **Criminal law ⚖➟126(2)—Change of venue in murder case for local prejudice held properly denied, where examination of jurors on voir dire showed no prejudice.**

Where examination of jurors on voir dire showed no ground for claim that accused in murder case could not get a fair trial, and jury was selected after only 36 jurors were examined, and only 7 challenged for cause by accused, motion for change of venue because of local prejudice *held* properly overruled.

2. **Jury ⚖➟103(14)—Juror having impressions removable by evidence held not disqualified.**

Juror who had read of case in newspapers, from which he received some impressions which could be removed by evidence and who would be governed by evidence, *held* not disqualified.

3. **Jury ⚖➟131(13)—Though jurors may be examined on voir dire three at a time, it is more orderly to examine them separately.**

Though calling and examination of jurors on voir dire three at a time is legal, it is more orderly since passage of Act No. 113 of 1896, allowing testimony to be taken on objections and annexed to bill of exceptions, if each juror is examined separately, so that examination of one juror may not be confused with that of another.

4. **Indictment and information ⚖➟139—Objection that polling of grand jury nullified indictment should be raised by motion to quash before trial.**

Objection that polling of grand jury nullified its action and rendered indictment void, if tenable, should have been raised by motion to quash before trial and not after jury was impaneled.

5. **Grand jury ⚖➟41—Polling of grand jury held not to affect validity of indictment.**

Polling of grand jury when they returned a true bill against defendants did not affect validity of indictment; secrecy of grand jury proceedings being wholly in interest of state and being of no concern to accused.

6. **Criminal law ⚖➟404(1)—Bloody articles, not identified as belonging to accused or deceased, found at place of alleged homicide, held admissible to prove venue.**

Bloody shirt sleeve and handkerchief, not identified as property of accused, or of deceased, found at alleged place of homicide where deceased's bloody cap was found, *held* properly admitted in evidence to prove venue by showing that blood was found at that place.

7. **Criminal law ⚖➟528—Accused's confession voluntarily made to throw blame on codefendant, held properly admitted in evidence.**

Accused's written confession, voluntarily made to throw blame for actual killing on codefendant, *held* properly admitted in evidence in murder prosecution where he was warned that it might be used against him, notwithstanding his statement that he was told it would be better for him to confess, where he did not pretend that he thereby understood anything in particular.

8. **Criminal law ⚖➟404(4)—Admission in evidence of remains of deceased's burned automobile held not error, where accused's possession thereof after the killing was proved.**

Admission in evidence in murder case, of remains of deceased taxicab driver's burned automobile, *held* not error, where automobile was identified and numerous witnesses testified as to its having been in accused's possession after the killing.

9. **Criminal law ⚖➟625—It is trial judge's duty on another's suggestion of accused's present insanity, or on his own motion, to inform himself thereof; method being in his discretion.**

It is duty of trial judge on suggestion from any one of accused's present insanity, or on his own motion if he has any doubts, to inform himself that accused is in mental condition to understand his position and present his defense; and method of procedure to that end is entirely within judge's discretion.

10. **Criminal law ⚖➟625—Reason for examination as to accused's present sanity is immaterial; essential fact being that result was laid before jury in open court in accused's presence.**

Reason for examination of accused by lunacy commission appointed by trial judge to determine question of his present sanity is immaterial, relevant fact being that commission made examination, and that result there-

·of was laid before jury by their testimony in open court in accused's presence.

**11. Criminal law ☜625—Act governing examination and commitments of insane persons held inapplicable to criminal case involving present insanity (Act No. 68 of 1918).**

Act No. 68 of 1918, governing proceedings for examination and commitment of insane persons, *held* not applicable to criminal case where accused claimed present insanity.

**12. Criminal law ☜393(1)—Testimony of lunacy commission held not objectionable as forcing accused to give evidence against himself.**

Admission in evidence of testimony of physicians appointed as lunacy commission by trial judge, without being asked to do so by accused, *held* not objectionable as forcing accused to give evidence against himself.

**13. Constitutional law ☜33—Constitutional provision relating to privilege between physician and patient is not self-operative, and there is now no law on subject (Const. 1921, art. 6, § 12).**

Const. 1921, art. 6, § 12, relating to privilege between physician and patient, is not self-operative, and there is now no law in this state on that subject.

**14. Witnesses ☜211(2)—Testimony of coroner and private practitioner, who observed accused in jail, as to accused's sanity, held not privileged.**

Testimony of coroner and parish physician and of private practitioner, who had visited and observed accused in jail, as to their opinion of accused's sanity, *held* not privileged.

**15. Criminal law ☜354—Testimony as to how accused, claiming present insanity, occupied himself in jail, held not objectionable as irrelevant.**

Admission of testimony as to how accused, who claimed present insanity, occupied himself during his incarceration in jail, over objection of irrelevancy, *held* not error.

**16. Criminal law ☜452(2)—Admission of testimony of nonexperts that they observed accused's conduct in jail and that he appeared to be sane held not error.**

Admission of testimony of nonexpert witnesses that they had observed conduct of accused while in jail and that to them he appeared sane, *held* not error, under rule that nonexpert witnesses may testify as to their belief in sanity or insanity of person, giving facts on which they base their opinion.

**17. Criminal law ☜1091(10)—Bill of exceptions not showing that trial judge was asked for ruling and exception taken thereto presents nothing for review.**

Bill of exception, not showing that trial judge was asked for a ruling and an exception taken to such ruling when made, presents nothing for review by appellate court.

**18. Criminal law ☜713—District attorneys may argue cases to jury with same latitude as defense counsel.**

District attorneys are entitled to argue their cases to the jury with the same latitude as counsel for the defense, though they may not go outside the record to bring to jury's attention any facts connected with the case not in evidence, nor to appeal to jury's prejudices, and if they do so they should be stopped by trial judge and jury instructed to disregard remarks.

**19. Criminal law ☜713—District attorney's statement in argument against insanity plea, that jury was confronted with same situation presented in notorious case in another state, held not prejudicial.**

District attorney's statement in argument to jury against plea of insanity, that jury was confronted with serious problem, which was the same as that presented to the people of Illinois in the famous Leopold and Loeb Case, *held* not prejudicial, but was a legitimate reference to an event in current history.

**20. Criminal law ☜625—Trial court's reservation of question of present insanity until after verdict and denial thereof at that time held not error.**

Trial court's refusal to take case from jury at close of evidence and to declare accused presently insane and commit him to an insane asylum, and his reservation of ruling thereon until after verdict and denial of motion at that time *held* not error.

**21. Criminal law ☜1160—Jury's verdict, approved by trial court, is conclusive on appeal on issue of accused's sanity when offense committed.**

Jury's verdict, based on voluminous evidence, approved by trial court was conclusive on issue of accused's insanity at the time of commission of crime and of his responsibility for the crime, and could not be reviewed on appeal.

**22. Criminal law ⊕625—Test of accused's "present insanity," to prevent trial, is his ability to understand situation in which he stands and to present defense.**

Test of present insanity of accused which will prevent a trial of criminal action is whether accused is sufficiently sane at time of trial and during course of trial to understand his situation and to present his defense and whether on appeal from conviction he understands situation in which he stands, and same rule applies to person convicted and about to be executed.

**23. Homicide ⊕237—Record held to show accused was sane when tried, convicted, and sentenced for murder.**

Record *held* to show that accused was sane when tried, convicted, and sentenced for murder.

Appeal from Fourteenth Judicial District Court, Parish of Beauregard; Jerry Cline, Judge.

Joe Genna was convicted of murder, and he appeals. Affirmed.

Ferguson & Newman, of Leesville, for appellant.

Percy Saint, Atty. Gen., John J. Robira, Dist. Atty., and S. H. Jones, Asst. Dist. Atty., both of Lake Charles, and Ped C. Kay, of De Ridder (E. R. Schowalter, of New Orleans, of counsel), for the State.

ST. PAUL, J. The defendant and one Molton Brasseaux were jointly indicted for the murder of one Joe Brevelle. They both moved for a change of venue and for a severance. Brasseaux moved for a commission to inquire into his present sanity. This defendant did not; but suggested in his motion for severance that his defense would be "mental irresponsibility." A commission was appointed and reported both accused *presently sane;* but the result of that examination was never laid before the jury who tried this accused [nor before that which tried Brasseaux], since under our jurisprudence the jury had nothing to do with that question. State v. Cropper, 153 La. 545, 96 So. 116.

163 LA.—23

The motions for change of venue were consolidated for trial and tried upon the same evidence, and both motions were denied.

The motions for severance were not opposed by the state and were granted by the court.

The two accused were thereupon separately tried. Both were found guilty as charged, and were sentenced to death, and both have appealed. See State v. Brasseaux, ante, p. 686, 112 So. 650, this day decided.

Both accused made a written confession as to the crime, each incriminating both himself and the other accused, but each claiming that the other did the actual killing, though admitting that he himself assisted in the killing.

### I.

The practically undisputed facts of the case are these: The two accused conspired together to rob Brevelle, a taxicab driver, of his money and of his car, for the purpose of leaving the town of De Ridder, of which the two accused had grown tired. Thereupon they hired the deceased to drive them some distance into the country, having first secured Texas license plates (Texas being their ultimate destination, via Orange), and having provided themselves with the steel leaf of an automobile spring as a weapon suited to their purpose.

When they arrived at a lonely spot on the road, this defendant (who sat in the back seat whilst the other accused sat in front with Brevelle) struck the deceased on the head with the steel spring leaf, and thereupon one of them continued to strike him with the spring leaf whilst the other held him as he struggled and cried for mercy; then one of them stabbed him through the heart with a knife or screw driver and cut his throat.

This happened at a spot in Beauregard parish, where the bloody cap of the deceased was afterwards found, as also a bloody shirt sleeve

and handkerchief (not identified as the property of any of the three).

The two accused then pushed the body aside from the driver's seat, and with the body still in the automobile turned round and came back towards De Ridder. But just before reaching there they turned into another road and, going some 20 miles or so into an adjoining parish (Vernon) threw the body into a millpond. They then came back to De Ridder, where they got their clothes and then proceeded towards Tullos, La Salle parish, to pick up two young women before proceeding on their way to Texas.

This was on Saturday night, August 28th last. They reached Tullos Sunday morning, where they found the two young women; this defendant remained in and around Tullos until Monday night and Brasseaux drove with one of the women to Vidalia, Concordia parish, on Sunday, but returned to Tullos on Monday.

On Monday night the two women were arrested on the charge of stealing an automobile (apparently not this one) and were incarcerated in the Tullos lockup. When this occurred Brasseaux left promptly, went to Monroe, came back to Lake Charles, and then went to his home at Sulphur, Calcasieu parish, which he reached Wednesday night and where he was arrested Thursday afternoon.

This defendant remained in Tullos Monday night, went to the lockup about 5 o'clock Tuesday morning, broke it open, and released the two women; the three of them then came in Brevelle's automobile to De Ridder, where they picked up one Harvey Perkins that night and then went to Lake Charles and to the ferry crossing the Sabine river near Orange, Texas. There this defendant burnt the automobile and then crossed to Orange, Tex., which he reached Wednesday morning and where he was arrested Thursday morning, and he was placed in the jail at De Ridder Thursday night.

He made his confession that night, but had already admitted the killing to Perkins and to one of the women (Katie Sadler), and the automobile had been recognized by Perkins and by the other woman (Edna Sadler), who, however, did not know of the murder until informed of it later on by Perkins, though suspicious of something of the kind because of the blood spattered about the car.

The body of Brevelle was found during the day of Monday, August 30th. That fact and the disappearance of his automobile were the only two things known to the people of De Ridder on Thursday night when this defendant was placed in jail.

This defendant was 23 years old; his codefendant was 24. And, to make a long story short, we read between the lines of the two confessions that each of these accused admits the conspiracy to rob the deceased, but would have it that the other went beyond the original purpose and thus involved him in the crime of murder, which he did not contemplate at first. Cf. State v. Birbiglia et al., 149 La. 4, 88 So. 533 (confession of Zalenka, p. 30); State v. Rini et al., 151 La. 163, 91 So. 664 (confession of Deamore, p. 169).

## II.

[1] The motion for a change of venue was based principally on the fact that a crowd of some 150 to 200 persons, including some women (and possibly some children), congregated about the jail after the fact became known that some one had been arrested in connection with the crime, and that there was some talk by irresponsible persons indicating that he deserved to be lynched if guilty. But the evidence shows conclusively that the crowd was orderly, was composed of some of the best citizens of the town, and was attracted there out of no other motive than to find out something about the crime and who had been arrested in connection therewith.

The evidence taken on the motion, and on the examination of jurors on their voir dire,

satisfies us as fully as it satisfied the district judge that there was not the least ground for believing that the accused could not get a fair trial in the parish. And the fact is that the jury was selected after only 36 jurors were examined, only *seven* of whom where challenged for cause by this defendant, his challenges being allowed as to 6 and overruled as to one. Cf. State v. Birbiglia et al., 149 La. 4, 88 So. 533; State v. Rini et al., 153 La. 163, 91 So. 664; State v. Cropper, 153 La. 545, 96 So. 116; State v. Holbrook, 153 La. 1025, 97 So. 27; State v. Roberson, 159 La. 562, 105 So. 621.

### III.

[2] Bill of Exception No. 1 was taken to the refusal to sustain a challenge to the juror, Sample (afterwards excused peremptorily by the defense). This juror when examined by the district attorney said that he had discussed the case and read of it in the papers, but had formed no opinion and would try the case on the law and the evidence adduced at the trial. To counsel for the defense he admitted that what he had heard and read had made some "impression" on his mind "to a certain extent but not indelibly," and that it would require some evidence to remove it, more than if he had heard or read nothing about the case. This he explains by saying that he could not "read or discuss this thing without forming some kind of an opinion." He repeated that the impression was only a faint one, that the discussion was only "street talk," and that he would be "governed absolutely by the evidence and by the law" and would disregard everything else.

The challenge was properly overruled. In State v. Birbiglia, 149 La. 4, 88 So. 533, this court held that jurors who had formed an opinion, from newspaper accounts of the crime, so fixed that it would require strong evidence to remove it, yet if taken on the jury would put aside their opinion, presume the defendants innocent, be governed entirely by the evidence, and would not convict the defendants without proof of guilt beyond a reasonable doubt, were competent and could not be challenged for cause. In State v. Rini, 153 La. 57, 95 So. 400, this court held that jurors, who had formed an opinion from newspaper reports or hearing the case discussed, and declared that it would require strong, positive, or convincing evidence to remove such opinion, but testified that they could disregard such opinion and decide the case according to the law and the evidence, were not disqualified. In State v. Holbrook, 153 La. 1025, 97 So. 27, we approved that ruling as being in accord with the general rule (citing 16 Corpus Juris, 1154, § 2650), and held that it must be accepted as the law in this state. See, also, State v. Roberson, 159 La. 562, 105 So. 621.

[3] It is not out of place to remark here that the jurors were called and examined three at a time, which was perfectly legal (State v. Roberson, 157 La. 974, 103 So. 283), but it would be more orderly (since the passage of Act 113 of 1896, which allows testimony to be taken on objections and annexed to the bill of exception) if each juror were examined separately, so that the examination of one juror may not run into and (possibly) become confused with that of another, thus requiring the most laborious attention on the part of this court to keep such testimony in mind and not apply the testimony of one juror to the case of another.

### IV.

[4, 5] Bill of exception No. 2 was taken to a refusal of the trial judge to exclude all evidence whatever on the ground that the grand jury were polled when they returned "a true bill" against these defendants and each was asked whether that was his finding, to which all answered affirmatively. The contention is that "such procedure nullified the action of said grand jury and rendered the said bill of indictment null and void."

If such was the effect of that unusual procedure the manner and time of raising the point was by motion to quash and before entering upon the trial, not after the jury was impaneled as was done here. Cf. State v. Sandiford, 149 La. 933, 943, 90 So. 261. But the contention is wholly unfounded; the secrecy of a grand jury's proceedings is wholly in the interest of the state and does not concern the accused in the least. It may be said, however, that this unusual procedure occurred through a misunderstanding which is presently immaterial, and that the occurrence never came to the knowledge of the jury in this case except through the objection made by the defendant, and even then they did not learn how the grand jury stood. See Tr. vol. 3, p. 387.

## V.

[6] Bill of exception No. 3 was reserved to the admission in evidence of a bloody shirt sleeve and handkerchief found at the alleged scene of the killing, but not identified as the property of the accused or of the deceased.

They were found at the spot where the bloody cap of the deceased was found, and were offered to prove the venue by showing that there was blood at the place.

It was quite as competent to bring the bloody objects into court and testify where they were found as it would have been to testify that blood was found upon the ground at the spot. The one or the other was competent to show that blood had been spilt at a certain place, and it was for the jury to give to such testimony the weight to which they thought it might be entitled in determining whether a crime had been committed at that spot. Cf. State v. Aspara, 131 La. 940, 953, 37 So. 883.

## VI.

[7] Bill No. 4 was reserved to the admission of the confession of the accused. The evidence of the district attorney, assistant district attorney, sheriff, and chief deputy sheriff shows conclusively that the accused volunteered the confession and readily consented that it be reduced to writing; that he was neither threatened nor promised any reward. Aside from all other considerations, the defendant has vouched for the credibility and friendliness of the sheriff by calling him to the stand three times, once on the motion for change of venue, again to establish his insanity, and lastly to impeach some of the witnesses called against him. The defendant was even carefully warned as to his right to remain silent, and of the fact that his confession would be used against him and might hang him; all of which was more than our law requires. And the fact is that defendant knew that he had already admitted the killing to two persons and that the bloody automobile had been recognized by two witnesses; and the evident purpose of making the confession was to throw the blame for the actual killing upon his codefendant in the hope that *that* might serve perhaps to save his own life. Certain it is that after making the confession he declared that he felt much relieved.

His own testimony is that he made the confession because he was told it "would be better" for him to do so. Even if true this would not avail him, as such general expressions mean nothing—especially where the accused does not pretend that he thereby understood anything in particular. His further statement that he confessed because he feared the mob on the outside of the jail is not plausible, as denial would have been a safer course under such circumstances; and this statement is disproved by the fact that when he entered the jail there were only a few persons standing around, and that from the inside of the jail he could not see the crowd which afterwards assembled, and could not hear it because the crowd was perfectly orderly and quiet.

We have no doubt whatever that the confession was properly admitted in evidence.

Bills Nos. 5 and 7 were reserved to the admission before the jury of testimony as to the circumstances under which the confession was given, and are purely frivolous.

## VII.

[8] Bill No. 6 was reserved to the admission in evidence of the remains of the burnt automobile. The automobile was fully identified and shown by numerous witnesses to have been in the possession of the accused after the killing. The bill is without merit.

## VIII.

Bill No. 8 was reserved to the exclusion of some testimony to be given by the sheriff of Orange county, Tex. The evidence was clearly hearsay.

Bill No. 9 was reserved to the admission in evidence of the report of a commission de lunatico inquirendo before the county court of Orange, Tex., on the ground that the record was not certified according to the act of Congress. The record *was* properly certified.

Bill No. 10 was reserved to the fact that the district attorney asked an expert physician called by the defense how much he was receiving to testify, and thereby caused some laughter in the courtroom. The judge (liberally) excluded the answer, and says he heard no laughter; that there was certainly no disorder. The bill does not inform us what further action was requested of the judge, if any. It presents nothing for our consideration. See ruling on bill No. 20 (Infra XII).

## IX.

Bills Nos. 11, 12, and 13 were reserved to the admission in evidence of the testimony of three expert physicians as to the present sanity of the accused. The grounds of objection were that they had examined the accused as a commission appointed by the court without being asked to do so by the accused; that the examination amounted to a forcing of the accused to give testimony against himself.

[9-11] It was the duty of the judge, appealing to "the humanity of the court" (as the authorities term it), on a suggestion from any one, or even ex mero motu, if he had any doubts, to inform himself that the accused was in mental condition to understand his position and present his defense. And the method of procedure to that end was a matter entirely within his own discretion. The report of the experts was made to the judge only, and was never laid before the jury. They testified as experts only, and the fact that they examined the accused at the request of the court was never made known to the jury. But we are far from saying that it would have made any difference had it been made known to the jury that their examination had been made at the request of the court. It would make no difference why they examined the accused as to his sanity; the relevant fact was that they did make such an examination and that the result of that examination was laid before the jury by their testimony given in open court in his presence. Act 68 of 1918 has no application whatever to these proceedings. State v. Brodes, 157 La. 162, 102 So. 190; State v. Burnham, 162 La. 737, 111 So. 79.

[12] We fail to see wherein the accused was forced to give evidence against himself. He was forced to do nothing. He was looked at and spoken to; but even a cat may look at a queen, and no one need answer when spoken to unless he wishes to do so. And if this accused was more closely examined, it is certain that he willingly consented; in fact, on the trial of this case he invited these experts to examine him nude in the jury room in presence of the court, jury, and counsel.

We find no error in admitting the testimony of these doctors.

## X.

[13, 14] Bill No. 14 was reserved to the overruling of an objection to the following question put to one of these experts: "Have you

seen him (Genna) since he has been in jail?" The ground of objection was that this was privileged. The testimony given was that as coroner and parish physician he had visited and observed the defendant in jail and thought him sane.

The objection was intended to raise generally the question of privilege between physician and patient. But there is no law in this state on that subject, Const. 1921, art. 6, § 12, p. 26, not being self-operative. It will be time enough to interpret such a statute when one is passed; but this much is certain—that any such statute or general rule of law on that subject, intended to prevent the disclosure of frailties and imperfections, will never be interpreted by any court (unless clearly obliged to do so) as meaning that one who is accused of crime may overwhelm a jury with evidence of his insanity and shut off the evidence of any professional man with whom he has come in contact and done business as a sane man, for any statute which would have to be so interpreted would undermine and overthrow the very foundation of all criminal proceedings.

Bill No. 15 raises the same question in connection with the testimony of a private practitioner whom the accused had consulted. The physician violated no confidence whatever; he testified simply that the accused acted always as a sane man.

The bills are without merit.

### XI.

[15] Bill No. 16 was taken to the admission of testimony as to how the accused occupied himself during his incarceration in jail. Irrelevancy is the ground of objection, and the bill has no merit.

[16] Bills 17 and 18 were reserved to the admission of testimony by nonexpert witnesses that they had observed the conduct of the accused whilst in jail and to them he appeared sane. The rule is well settled that nonexpert witnesses may testify as to their belief in the sanity or insanity of a person, giving the facts on which they base their opinion. State v. Lyons, 113 La. 959, 37 So. 890. And the record teems with evidence of that kind adduced on behalf of the defendant.

### XII.

[17] Bill No. 20 relates to the remarks of associate counsel for the state. He said to the jury: "I have known the defendant for many years, and if he is insane—" Here he was interrupted by counsel for the defense, who "objected and reserved a bill thereto." The bill does not inform us what relief was asked of the court, but apparently none was asked.

The bill presents nothing for consideration. In State v. Poole, 156 La. 434, 440, 100 So. 613, we said that a bill of exception which does not show that the trial judge was asked for a ruling and an exception taken to such ruling when made presents nothing for the consideration of an appellate court. Citing 3 Corpus Juris, 894, 895, and State v. Judge, 12 La. Ann. 113.

Bill No. 21 was reserved in connection with a remark of the assistant district attorney to this effect:

"You, gentlemen of the jury, are now confronted with the most serious problem ever presented to the people of Beauregard parish. It is for you to say whether or not henceforth there shall be law enforcement or not. You are confronted with the same situation [synonymous with, state of facts] as was presented to the people of Illinois in the famous Leopold and Loeb Case."

Counsel for the defense requested the court to instruct the assistant district attorney to desist from referring to any case in Illinois or any other state in his argument to the jury; which request was denied and a bill reserved.

The remark was made "in a general argument against the plea of insanity in this case. There was nothing improper or prejudicial in the remark"—thus the district judge.

[18] District attorneys are entitled to argue their cases to the jury with the same latitude

as counsel for the defense. It is a mistake to suppose otherwise. It is true they may not go outside of the record to bring to the attention of the jury any facts *connected with the case* which have not been given in evidence; nor should they appeal to the *prejudices* of the jury (supposed or real); and if they do so they should be stopped by the trial judge and the jury properly instructed and directed to disregard such remarks.

But aside from this, their right to argue their case with all the eloquence at their command is quite as extensive as that of counsel for the accused. And we have always found that trial judges, sitting as moderators in these warm debates, are quite competent to keep the arguments of counsel for the state toned down to the proper key.

[19] In the case before us the remarks of the district attorney could be no more prejudicial to the accused than if he had referred to the story of Cain and Abel, or the assassination of Julius Cæsar, or the French Revolution; just as the attorney for the defendant would have been quite free, if he chose to do so, to refer to Magna Charta, the Bill of Rights, and the Declaration of Independence, without overstepping the bounds of propriety in any manner whatever. Literature and history are open to all men; and the Leopold and Loeb Case is an event in current history which is not undeserving of deep thought.

## XIII.

[20] Bill No. 19 relates to the refusal of the trial judge to take the case out of the hands of the jury at the close of the evidence, and to declare the accused presently insane and commit him to an asylum for the insane. The trial judge refused to take the case from the jury, and reserved his ruling on present insanity until after the verdict was rendered. This was in accord with our ruling in State v. Cropper, 153 La. 545, 96 So. 116. After the verdict the judge denied the motion to declare the accused insane, and a bill was reserved.

[21] We find no error in the ruling. The motion was submitted on the evidence taken at the trial, all of which is before us. That evidence is voluminous, and all bore upon the question submitted to the jury as to insanity at the time the crime was committed; i. e., as to *insanity which relieves the accused from responsibility for the alleged crime.* With that question this court has nothing to do; the verdict of the jury and approval thereof by the trial judge being final.

[22] The question before us is altogether different. It is whether the accused was sufficiently sane at the time he went to trial and during the course of that trial to understand his situation and to present his defense, and whether he now understands the situation in which he stands.

The rule is thus laid down in Wharton & Stillé, Medical Jurisprudence, vol. 1, p. 210, § 206 (5th Ed. 1905):

"The test of present insanity which will prevent a trial in a criminal action is whether the person is mentally competent to make a rational defense. And the question is whether the accused was sane enough to present to counsel the facts which ought to be stated and presented to the jury upon his trial. The knowledge of right and wrong as a test of insanity does not apply to a collateral proceeding to ascertain the mental capacity of the person about to be put on trial for a criminal act. A person arraigned for crime, however, who is capable of understanding the nature and object of the proceeding against him, and who comprehends his own condition in reference to it, and can conduct his defense in a rational manner, is to be deemed sane for the purpose of being tried; although on some other subjects his mind may be unsound"—citing Freeman v. People, 4 Denio (N. Y.) 9, 47 Am. Dec. 216, the leading American case on that subject, and also other American and English cases.

See, also, 16 Corp. Jur. 791, § 2017, note 56.

And the rule is substantially the same as to a person convicted and about to be executed. He must be capable of understanding the situation in which he stands and the nature of the proceedings against him. State v. Smith,

25 N. M. 48, 176 P. 819, 3 A. L. R. 83, and note at page 94 of 3 A. L. R.

[23] The evidence in this case contains not even a line tending to show that this accused does not know the nature of the proceedings against him, or was incapable of presenting a rational defense, or that he does not understand the situation in which he now stands.

On the contrary, the record is conclusive of the fact that he does understand the nature of the proceedings against him, that he was capable of presenting a rational defense, that he was capable of consulting with and assisting counsel, and that he does know the situation in which he now stands. And that evidence has all been furnished by himself in a manner which leaves no room whatever for doubt. Thus:

He swore to his motion for change of venue. He swore to his motion for a severance. He swore to his motion for a new trial. He took the stand three times in his own behalf, once to deny that his confession was voluntarily given, once to declare that though once acquitted of sodomy he was none the less guilty thereof, and once to expose his dissipations and small thefts. His confession was *dictated*, yet it is a clear, consecutive, and accurate account of all his movements from the time when he first spoke to the other accused until his arrest five days afterwards.

And since from the evidence which he has placed before us we are as much convinced as was the jury that he never was insane at any time, we are now without shadow of doubt that he was sane when he was tried and sane when he was convicted and sentenced.

We see no error in the refusal of the trial judge to discharge the jury or to commit the accused to an asylum for the insane.

### DECREE.

The judgment appealed from is therefore affirmed.